FRANCIS S. PIEKARCZYK, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Piekarczyk v. Commissioner
Docket No. 734-84.
United States Tax Court
T.C. Memo 1986-359; 1986 Tax Ct. Memo LEXIS 247; 52 T.C.M. (CCH) 128; T.C.M. (RIA) 86359; August 7, 1986. Francis S. Piekarczyk, pro se. Teri A. Frank, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: For the calendar year 1980, respondent determined a deficiency of income tax against petitioner in the amount of $1,197, together with additions to tax under sections 6651(a) and 6653(a), [1] in the respective amounts of $299.25 and $79.85. After concessions *248 on both sides, the sole issue for our determination is whether petitioner suffered a deductible loss in 1980 on account of the alleged worthlessness of certain stock owned by him. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. At the time the petition herein was filed, petitioner was a resident of Chicago, Illinois. Petitioner's individual income tax return for the calendar year 1980 was received by respondent's Kansas City Service Center on September 11, 1981. Petitioner thereafter filed an amended return on Form 1040 X for 1980, received by respondent's Kansas City Service Center on December 24, 1981, in which petitioner claimed a long-term capital loss of $19,688 with respect to 126 shares of stock in Lansing Air Charter, Inc., which petitioner alleged he owned and which became worthless in 1980. In his petition herein, such amount was *249 increased to $23,000. Lansing Air Charter, Inc. ("Lansing") was incorporated in Illinois on April 20, 1978. It was involuntarily dissolved on December 1, 1980 by the State of Illinois for failure to file its annual report and pay taxes. For some undisclosed time during this period, Lansing did business under the name "Eagle Air" or "Eagle Transport." From about December 1, 1978 until December 1979, Lansing conducted business at the Lansing, Illinois, Municipal Airport, under a "temporary commercial operating agreement" entered into between Lansing and the Village of Lansing, Illinois. On December 9, 1979, the Village of Lansing terminated this temporary operating agreement, and Lansing conducted no business thereafter. Eagle Air, Inc., was incorporated in Illinois on November 28, 1979. It was involuntarily dissolved on December 1, 1980, for failure to file its annual report and pay taxes. The record herein does not disclose who the stockholders of Eagle Air, Inc. were, nor that it ever transacted any business. Robert J. Doll ("Doll") was a man who, for several years prior to 1978, had been employed by an aircraft dealership in the area of Lansing, Illinois. In 1976, petitioner *250 purchased through Doll a Grumman American Cheetah airplane, and also purchased some radio and navigation equipment for the plane. Petitioner sold this airplane in 1978, and reported in his 1978 income tax return a loss therefrom in the amount of $727. At some time after 1976 and prior to 1978, the airplane dealership for which Doll worked apparently failed. Doll approached petitioner and represented to him that there was a business opportunity for another small aircraft dealership in the Lansing, Illinois area, and sought petitioner's assistance in putting such an enterprise together. Additionally, Doll was negotiating with at least two other persons in the area as potential partners or investors in the new aircraft dealership. Apparently even prior to the formation of Lansing in April 1978, there were various financial transactions between petitioner and Doll. The record is not clear whether these transactions were purchases of equipment from Doll by petitioner, loans from petitioner to Doll, or investments in the proposed new enterprise which had not yet been incorporated. After its incorporation, Lansing, d/b/a Eagle Air, was very loosely operated, but appears to have been *251 under the effective control of Doll at all times. In the period 1978-1979, petitioner made payments by check to Doll, Lansing and/or Eagle Air as follows: Purpose of Payment
Date of Check
Amount
Payee
Stated on Check
Dec. 27, 1978
$ 1,500.00
Robt. J. Doll
Jan. 10, 1979
1,045.00
Lansing Air
Jan. 16, 1979
400.00
Eagle Air/
Lansing Air
RG   [2]
Jan. 15, 1979
100.00
Lansing Air/
Eagle Air
Equity RGII
March 8, 1979
1,000.00
Eagle Air
ADF gear [balance
illegible] [3]
June 3, 1979
1,250.00
Lansing Air
Charter
Aug. 23, 1979
1,191.00
Lansing Air
Charter
Aug. 28, 1979
1,000.00
Eagle Air
Sept. 12, 1979
1,600.00
Eagle Air
July 13, 1979
1,599.32
F. S. Piekarczyk/
Lansing Air
Charter d/b/a
Eagle Air
re: N2055E [4]
Total
$10,685.32
In June 1979, petitioner purchased from Lansing a 1979 Cessna Skyhawk Model 172 airplane, whose identification number was N2255E. At *252 that time, the retail list price of such an airplane, including the optional equipment with which this plane was equipped, was in the neighborhood of $35,000. Although this Cessna airplane was a new plane which Lansing had for sale as a distributor of Cessna, it had been damaged, and petitioner purchased it for less than the retail list price. Petitioner secured a loan from the Beverly Bank of Chicago, in the total amount of $35,824.80. Of this amount, $24,900.68 was paid to the Cessna Finance Corporation through a bank in Wichita, Kansas, and $1,599.32 (shown in our listing above), was paid to Lansing Air, for a total purchase price of $26,500. At the time the Cessna aircraft was damaged (prior to petitioner's purchase), it was insured against accidental damage. Pursuant to a damage claim made by Lansing Air, the insurers paid Lansing Air $8,809 (after a $500 deductible) on account on this accidental damage. OPINION Petitioner claims that he experienced a long-term capital loss in the year 1980 on account of the alleged fact that 126 shares of Lansing which he owned became worthless in that year. Such a loss, if proved, would be allowable under the provisions of section *253 165(g). [5] The amount of such loss is the taxpayer's cost basis, as provided in section 1011. In order to qualify for the claimed deduction, it must be established (a) that the taxpayer was the owner of such stock; (b) the taxpayer's cost basis therein; and (c) that the stock became worthless in the taxable year in question. The burden of proof as to all these matters was upon petitioner. ; Rule 142(a).
Upon this record, we must hold that petitioner has failed to carry his necessary burden of proof to show that he was either the owner of any stock in Lansing, or, if he was, his cost basis in such stock. As to the fact of *254 petitioner's ownership of any stock in Lansing, the record is singularly deficient. Aside from a self-serving document, executed by petitioner and others, stating that petitioner was the owner of 25 percent of the outstanding shares of Lansing, which document was executed for unknown purposes sometime in the year 1979, we have only petitioner's vague and rambling testimony on the point. No corporate records evidencing petitioner's ownership were produced, nor were any stock certificates in petitioner's name offered in evidence. No other witness appeared at trial to corroborate petitioner's claim of ownership. Cf. ; . So far as petitioner's alleged equity investment in Lansing is concerned, which could serve as a cost basis for his claimed shares, the record is equally inconclusive. It is unquestioned that there were a multiplicity of transactions between petitioner, on the one hand, and/or Doll and Lansing on the other hand. The money transfers from petitioner are detailed in our findings of fact. Petitioner claims that they all represented equity *255 investment by him in the stock of Lansing, made at various times and in various amounts during the period of Lansing's existence. Close examination of the transfers, however, fails to support this contention. With respect to the payments of $400, $100, $1,000, and $1,599.32, it is clear that the latter payment was part of the purchase price of the Cessna Skyhawk airplane which petitioner purchased from Lansing in 1979. The other three checks were clearly marked on their face as being for the purchase of an airplane, or aerial navigation equipment. As to these three items, petitioner's testimony was extremely vague and contradictory and we have accepted these checks as payment for the purposes shown thereon. With respect to the other checks detailed in our findings of fact, petitioner at trial either was unable to state with any certainty what the payments were for, when specifically asked about them on cross-examination, or failed to testify with respect to the items at all. We are thus unable to accept any of the payments, totaling $10,685.32, as detailed in our findings of fact, as constituting equity investments by petitioner in the stock of Lansing. In addition to these *256 payments, however, petitioner contends that he made a further equity investment in Lansing in the amount of the insurance recovery for the damage to the Cessna Skyhawk plane, in the amount of $8,809, which petitioner urges should be credited to him because he allowed Lansing to keep the insurance recovery money, while buying the plane and undertaking to restore it at his own expense. We find this argument entirely confusing and unconvincing. What the record shows is that petitioner bought an aircraft from Lansing. Prior to petitioner's purchase, the aircraft had been damaged. The regular retail price of the aircraft was about $35,000, and petitioner paid $26,500 for it in its then condition. Lansing, as seller owner, got the insurance recovery to which it was entitled. The difference between petitioner's purchase price at $26,500 and the regular retail price of $35,000, or about $8,500, is very close to the amount of the insurance recovery, and clearly gives effect to the loss of value in the damaged plane. Under the circumstances, we can find no theory which would support petitioner's argument that somehow he made an equity investment in Lansing by allowing Lansing to keep the *257 insurance recovery to which it was clearly entitled. Lansing got the insurance recovery, and petitioner got the benefit of the reduced price for the plane in an "as is" condition. In sum, and after trying vainly to make some sense out of petitioner's rambling and sometimes inconsistent and incoherent testimony, we must conclude that petitioner has failed to prove either that he was the owner of any stock in Lansing, or, if he was, what his cost basis was in such stock. Having so concluded, it is unnecessary for us to consider the third prong of petitioner's necessary proof, as to the year of worthlessness of such stock. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. The references to "RG" or "RGII" relate to a Cessna Skylane RGII aircraft. ↩
3. The reference is to automatic direction finder equipment for an aircraft. ↩
4. Refers to purchase of an aircraft. See infra↩ herein.
5. As herein relevant, sec. 165(g) provides as follows: (g) Worthless securities. -- (1) General Rule. -- If any security which is a capital asset become worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset. (2) Security defined. -- For purposes of this subsection, the term "security" means -- (A) A share of stock in a corporation; * * *.↩